IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 7, 2005

## STATE OF TENNESSEE v. KEVIN SMITH

**Direct Appeal from the Circuit Court for Madison County**
**No. 04-142     Roger A. Page, Judge**

_____

**No. W2004-02225-CCA-R3-CD  - Filed August 29, 2005**

_____

The defendant, Kevin Smith, was convicted of two counts of spousal rape and one count of aggravated assault, both Class C felonies. After merging the aggravated assault conviction with one of the spousal rape convictions, the trial court sentenced the defendant as a Range I, standard offender to six years for each rape conviction, to be served consecutively, for an effective sentence of twelve years. The issues on appeal are whether the trial court properly concluded that the defense would open the door for the victim to testify about the defendant's prior bad acts if asked why she did not resist the assault and whether the trial court properly sentenced the defendant. Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

George M. Googe, District Public Defender, and David H. Crichton, Assistant Public Defender, for the appellant, Kevin Smith.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On August 25, 2003, the defendant, who was separated from the victim, his wife, drove her from her workplace in Jackson, threatened her with a knife and a razor, and forced her to perform two different sexual acts with him. This appeal followed his convictions for various offenses as the result of the episode.

Thomas Ross Jennings, the victim's supervisor, testified that the victim was his "best employee. . . . She's there always to work on time. I have no complaints about her performance." He said the victim was scheduled to begin work at 2 p.m. on August 25, 2003, and had not called to say that she would be late which was "very uncharacteristic for her." When the victim still had not reported for work at 4:00 p.m., Jennings "thought that something was wrong" and informed the victim's team leader, Carla Musgrave.

Carla Musgrave, the human resource manager at the victim's place of employment, testified that when the victim did not report for work, she had the operator call the victim's home but did not get an answer. Because it was unusual for the victim not to call if she was going to be late, Musgrave and other employees informed their asset protection team leader, who reviewed the parking lot security videotapes and saw "that there was a possible abduction." Musgrave then called 9-1-1, and two police officers responded to the scene. While Musgrave was giving her statement to the officers, she saw the victim and the defendant pull into the parking lot in the victim's vehicle. The police took the defendant into custody, and Musgrave observed that the victim was "very startled and just in a daze." Musgrave said she knew the defendant because they had gone to school together and knew that he and the victim were married.

In her testimony, the victim recounted that she and the defendant had tried to reconcile in the spring of 2003, which entailed living together and engaging in sexual intercourse, but were separated at the time of the incident. She said she arrived at her workplace at about 1:40 p.m. on August 25, 2003, and was sitting in her vehicle with the window down when the defendant approached and asked about their children. The defendant told her to "[s]coot over" to the passenger seat and, when she refused, he "physically moved [her] over."

The defendant then drove her vehicle to a deserted parking lot and began asking questions about her boyfriend. She said she told the defendant that she had to be at work and that "[h]e knew it." The defendant, "upset" and "angry," asked her to get in the backseat and, when she refused, put a silver-handled knife against her arm and forced her to do so. He placed the knife against her chest to get her to remove her pants. She said the defendant then lowered his pants, put on a condom, penetrated her vagina, removed the condom, penetrated her again, put the condom back on, and penetrated her once again. At some point, the victim saw the condom on the console of her vehicle, but she did not know when the defendant had taken it off because she had closed her eyes. She said the defendant was not wearing the condom when he ejaculated inside her.

The victim said she was allowed to get in the driver's seat after the rape and the defendant moved to the passenger's seat and suggested they get back together, which she rejected since "[she] was involved and very much in love with someone else." After telling her if she divorced him and married her boyfriend, he would kill her boyfriend, the defendant retrieved a long razor from his wallet, asked her if she had "ever been cut with a razor," and directed her to get in the backseat again "or else he would cut [her]." The victim complied, and the defendant also moved to the backseat where he "told [her] to suck him" and "if [she] lifted [her] head that he would cut the back of [her] neck." She said the defendant forced her to perform oral sex on him and then ejaculated on a blue

towel. Afterwards, they moved back to the front seat and the defendant allowed her to drive back to her workplace where the defendant was arrested while she gave her report to the police. She then went to a hospital where a rape kit was collected.

Officer Danielle Jones of the Jackson Police Department testified that she was dispatched to the victim's workplace at approximately 4:45 p.m. and, while taking statements from the victim's coworkers, observed the victim and the defendant drive up in the victim's vehicle. The defendant was taken into custody for kidnapping and rape and, when searched, was found to possess "a knife, a razor blade, and a used condom."

Investigator Tyreece Miller of the Jackson Police Department testified that he responded to the scene, where he collected a blue towel from the victim's vehicle. Later that evening, he interviewed the defendant who said the victim had consented to having sex with him. The defendant told Miller that the razor blade fell out of his wallet when he opened it to give the victim some money and that the knife came out of his pocket when he was searching for money. Miller testified the defendant gave an additional statement the next day, saying he pulled the knife out after he and the victim had sex the second time and that he had pointed the knife at the victim and threatened to kill her boyfriend.

The defendant's only witness was Janice Tanner, the nurse who performed the rape kit on the victim. She said the victim was "calm" and had no physical injuries consistent with rape but acknowledged that not all rape victims are distraught when the kit is being performed or have physical injuries.

## ANALYSIS

### I. Prior Bad Acts

The defendant argues the trial court erred when it ruled that the defense would "open the door" for the State to introduce evidence of previous incidents of violence by the defendant against the victim by asking her if she struggled during the rapes.

Generally, evidence of prior criminal conduct is inadmissible, absent certain well-defined exceptions, as our supreme court explained in State v. Rickman, 876 S.W.2d 824 (Tenn. 1994):

> The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. Such a potential particularity exists when the conduct or acts are similar to the crimes on trial.

Id. at 828 (citations omitted); see also State v. Rounsaville, 701 S.W.2d 817, 820-21 (Tenn. 1985); State v. Morgan, 541 S.W.2d 385 (Tenn. 1976).

The exceptions to this rule of exclusion require that the probative value of such evidence outweigh the danger of its prejudicial effect. Accordingly, evidence of prior criminal activity may be used to demonstrate identity, intent, motive or a common scheme or plan, opportunity, or rebuttal of mistake or accident, as opposed to showing the defendant's likelihood to commit the charged act. Tenn. R. Evid. 404(b); State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995).

In order to determine the admissibility of such evidence, compliance with the procedures provided in Rule 404(b) is mandatory. Without the trial court conducting the required analysis on the record, particularly regarding the existence of a material issue and the probative value of the evidence outweighing the danger of unfair prejudice, we cannot properly review its admissibility as an exception to the rule of exclusion. State v. West, 844 S.W.2d 144, 150 (Tenn. 1992). When the trial court has substantially complied with the requirements of Rule 404(b), this court reviews its decision to admit or exclude evidence under an abuse of discretion standard. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

We first will set out the "opening the door" discussion as it occurred at trial. During a sidebar conference, defense counsel informed the court of his intent to question the victim as to why there was no physical struggle:

THE COURT: What are you trying to get into?

[DEFENSE COUNSEL]: Well, the fact that there was no struggle, physical struggle during this time.

[THE STATE]: What he said in opening.

[DEFENSE COUNSEL]: Right. And the fact that she did not attempt to – there was no attempt at escaping.

THE COURT: You can ask her that, but she certainly has the right to explain why.

[DEFENSE COUNSEL]: Well, that's –

THE COURT: I'm going to let the State do that, if that's what you're asking me. That's what the ruling's going to be.

The court then ruled that the defense could ask the victim if she struggled, but, in doing so, would open the door to her explaining why she had not done so, if that was the case:

-4-

I don't know if – Here's my ruling. . . . You can ask the question about from the preliminary hearing. If you're going to get into questions with her about, you know, why she didn't struggle or why she was not afraid of him or why she went without a struggle, then [the State] has the right to get back into it when you open the door to let him letting her explain because of prior incidents between the two and he threatened her before. And I don't know what it is you're trying to get into.

Defense counsel then requested a jury-out hearing, during which he questioned the victim about whether or not she had struggled during the incident:

Q      During this whole time that this occurred there was no physical struggle?

A      No.

Q      You did not put up any physical fight whatsoever; is that correct?

A      That's correct.

Q      Okay. And why not?

A      I was scared.

Q      Okay. What about? I mean, why were you scared?

A      Because I know of the stuff that he's done before.

Q      Okay. And what kind stuff [sic] is that?

A      He has pulled a knife on me before.

Q      Okay. Have you both – Have you not ever assaulted [the defendant] himself and had fights with him where you've assaulted him?

A      Yes, protecting myself.

After hearing the testimony, the trial court followed the procedures required by Rule 404(b) in determining that testimony as to prior bad acts was relevant to a material issue and that its probative value outweighed the danger of prejudice:

All right. Under Rule 404(b) here of the Tennessee Rules of Evidence, what we're actually discussing is prior bad acts of the Defendant. And [defense counsel] is wanting the Court to make a ruling on whether or not by asking [the victim], you

know, why she didn't struggle or why she didn't jump or try to flee if he's opening the door to these prior bad acts of his client.

And after hearing her testify I'm going making [sic] a finding for the record – of course, this is outside of the jury's presence – that this evidence is relevant to material issue, material issue being whether her credibility is part of it. And the other part of it is to explain to the jury why she didn't struggle.

And I will explain to the jury that – if this evidence comes in – that it should be used only for credibility and not anything else; of course, not as probative value as to whether or not this Defendant committed this crime.

But I'm going to find the probative value of the evidence is not outweighed by the danger of unfair prejudice. Of course, I'm making a finding that this did occur, and that finding is required by I believe the State vs. DuBose case be made by clear and convincing evidence. So I'm making that finding.

Rule 404(b), relied upon by the defense counsel at trial and on appeal, sets out the procedure for determining whether prior bad acts are admissible:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

It is well settled that witnesses are allowed to fully explain and provide a reasonable context for their answers, regardless if the explanation involves prior events. See Sistrunk v. State, 630 So. 2d 147, 152 (Ala. Crim. App. 1993) (evidence of the defendant's previous drug offenses was allowed to correct and explain "adverse inferences" made by the opposing side); State v. Pankow, 895 So. 2d 1149, 1151 (Fla. Dist. Ct. App. 2005) (defense's questioning and inference about evidence of a struggle opened the door for the expert witness to show how the victim's marks corresponded to

struggle); Funderburk v. State, 471 S.E.2d 535, 536 (Ga. Ct. App. 1996) (defense's questions about a chemical test opened the door for the witness to give reasons for the test not having been performed, so as to correct a mistaken inference); Commonwealth v. Charles, 712 N.E.2d 613, 615 (Mass. App. Ct. 1999) ("[A] witness should have the opportunity to explain why he or she did or did not do certain things which were the subject of questioning on cross examination."); State v. Hammond, 435 S.E.2d 798, 801 (N.C. Ct. App. 1993) (witness may testify on redirect "that her husband [the defendant] 'beat [her] all the time'" to explain her cross-examination testimony). Accordingly, we conclude that this claim is without merit.

The defendant also argues that the "[c]ourt erred in finding 'clear and convincing' proof of this incident," in failing "to explain its reasoning" in determining that the probative value outweighed the prejudicial danger, and "in not allowing the [d]efense to put on any proof in rebuttal to show that the [d]efendant and the [v]ictim had previous fights where the [v]ictim was not scared of the [d]efendant." The first two claims are waived because they were not raised in the motion for new trial and, as well, no authorities were cited in the defendant's brief supporting them. Tenn. Ct. Crim. App. P. R. 10(b). While the third claim, that the defendant should have been allowed to present evidence to "rebut the testimony of . . . previous incidents" between him and the victim, was raised in the motion for new trial, no supporting authorities were set out in the defendant's brief. Accordingly, this claim is waived as well. See id.

## II. Sentencing

The trial court imposed consecutive six-year sentences, which the defendant claims is excessive. When an accused challenges the length and manner of service of a sentence, the standard of review is *de novo* with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the trial court's legal conclusions when sentencing the accused or determinations predicated on uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

At the sentencing hearing, both the defendant and the victim testified. The defendant described the victim as "a thorn in [his] side" and said he "would rather be as far as [he] can possibly be away from her." He denied pulling a knife on her, saying he "[j]ust had it out," but it was closed, and it was the first time he ever displayed a knife to her. The defendant also denied he had threatened the victim with the razor blade. However, he admitted signing a statement the day after the incident that said, "I pulled the knife out. I opened it and the blade was pointed towards her." He explained that although he signed the statement, he did not write it. Asked about a prior incident where the victim had been cut with glass, the defendant said she slammed her fist through a window because she was upset, causing her own injuries.

The victim testified the defendant previously had cut her with a knife multiple times. She described three incidents: "The first incident was when he cut me on the leg. And we were sitting in his vehicle . . . and he was just dropping the [pocket] knife on my leg . . . and it went through my jacket, through my jeans into my leg. And that day I had to call in to work because I couldn't put any pressure on my leg. I still have the scar." The victim continued, "The glass incident is where he pushed me and my hand – my arm hit the class. And I do have a scar right here," referencing her right wrist. Describing the third incident which occurred in the defendant's bedroom, the victim said, "I was standing up against the dresser and he had a [fish filet] knife out. And he was swinging it in my face. And I threw my hands up and it cut me right here [indicating right hand]. And I still have a scar, also." She acknowledged she never reported any of these incidents to the police.

## A. Sentence Length

The defendant was convicted of a Class C felony with a sentencing range of three to six years. Tenn. Code Ann. § 40-35-112(a)(3). When setting sentence length, the court "start[ed] with each offense, the minimum in the range which is three years, and [made] these findings with respect to enhancing factors on the record, supported by a preponderance of the evidence based on the testimony . . . heard." The trial court applied enhancement factors (2), previous history of criminal convictions or behavior, and (6), "exceptional cruelty," because of the two distinct rapes with two weapons over an extended time period. Tenn. Code Ann. § 40-35-114(2), (6) (2003). The court said that factor (2) "alone would be enough to enhance this up to the maximum sentence in each range," in addition to the "three prior incidents testified to by [the victim] . . . about prior criminal behavior concerning incidents when he cut her on at least two occasions and left scars." His convictions of "family" and "traffic offenses," "criminal trespassing," and vandalism were applied as enhancement factors as well. Additionally, the court stated it gave great weight to the defendant's previous acts of cutting the victim because the "[enhancement] factor talks about criminal behavior, not only criminal convictions." In mitigation, the court considered the defendant's steady job history and graduation from high school and Tennessee Technology Center.

The presence report showed the defendant had four previous convictions. In 1996, he was convicted of "vandalism (up to $500)" and sentenced to eleven months, twenty-nine days which was suspended to community corrections. In 1999, the defendant was convicted of a "traffic offense" for which he had to pay a "cash forfeit for illegal loitering." In 2001, he was convicted of criminal trespassing and a "family offense-other" and was sentenced to twenty-four hours and twenty-four hours of public service, respectively. The present matter involves the defendant's raping his wife twice at knifepoint. He has a pattern of criminal activities, and the trial court found that "he allowed her to be treated with exceptional cruelty." The record supports the trial court's imposition of the maximum sentences.

The defendant also argues that, in sentencing him, the trial court violated the holding in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). However, Blakely does not apply to Tennessee sentencing guidelines. State v. Gomez, 163 S.W.3d 632 (Tenn. 2005).

## B. Consecutive Sentencing

The defendant also argues that the trial court erred in ordering that his sentences be served consecutively. The ordering of consecutive sentences is purely discretionary; nevertheless, the trial court must find by the preponderance of the evidence that at least one of seven statutory criteria is met, of which the relevant sections are listed below:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]

Tenn. Code Ann. § 40-35-115 (2003).

In determining that the defendant's sentences should be served consecutively, the trial court concluded that he "is a dangerous offender [and] . . . his behavior evidences little or no regard for human life [and] . . . he had no hesitation about committing a crime where the risk to human life is high," because the defendant used both a knife and a razor blade to rape the victim. The court noted that "as the dangerous offender he doesn't have an extensive criminal record. However, he does have an extensive history with this particular victim . . . and I think that he is a dangerous offender,

especially with respect to [the victim]."  The court continued that, given the defendant is a Range I offender, he will be eligible for parole after serving 30%, but "[the victim] needs to be protected from him along with the general public" and without consecutive sentences, the defendant would "be eligible for parole in less than two years."  The court further found that "consecutive sentences in this case . . . certainly reasonably relate[] to the severity of the offenses."  We conclude that the record supports the trial court's consecutive sentencing of the defendant.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE